**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-00694 (TNM)** |
| **v.** | : | |
| | : | |
| **BRANDON PRENZLIN,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Brandon Prenzlin ("Prenzlin") to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.

**I.     Introduction**

The defendant, Brandon Prenzlin, a political organizer, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than $2.7 million in losses.[1]

---

[1]     As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol totaled $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On March 25, 2022, Prenzlin pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained herein, a sentence of 14 days' incarceration, with probation to follow, is appropriate in this case because: (1) Prenzlin admitted that he entered the Capitol despite his understanding that the siege on the Capitol was violent and unlawful; (2) Prenzlin knew that, on January 6, 2021, the Capitol grounds were restricted and that members of the public (including him) were not allowed to enter the area marked by bike rack barriers and guarded by police; (3) Prenzlin admitted that the chaos and the violence of the mob gave him cover to follow his "curiosity" and enter the Capitol building; (4) Prenzlin lied to the FBI, initially denying that he had entered the Capitol, and minimizing his conduct; and (5) Prenzlin has not been fully compliant with the conditions of his release in this case.

The Court must also consider that Prenzlin's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the certification vote. *See United States v. Rachel Lynn Pert and Dana Joe Winn*, 1:21-cr-00139 (TNM), Tr. 12/20/2021 at 42 (January 6th was "a shameful event, a national embarrassment that made all of us feel less safe, less confident that our country can be governed democratically rather than by mob rule.") (statement of Judge McFadden). Here, Prenzlin's participation in a riot that actually succeeded in halting the Congressional certification, combined with his lack of candor, render a brief term of incarceration, followed by probation, both necessary and appropriate in this case.

## II.        Factual and Procedural Background

### *The January 6, 2021, Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol.  *See* ECF 25 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent –contributed, directly and indirectly, to the violence and destruction of that day.   With that backdrop we turn to Prenzlin's conduct and behavior on January 6.

### *Brandon Prenzlin's Role in the January 6, 2021, Attack on the Capitol*

On January 6, 2021, Brandon Prenzlin was living in Arlington, Virginia, and working for a grassroots political organization in Washington, D.C.  On the morning of January 6, Prenzlin entered the District for work.[2]  He passed by the Capitol on his way to work and saw 200 to 300 people on the East Side of the Capitol.  He noted that these people were, at this point, outside of the security perimeter around Capitol grounds marked by bike-rack style barricades.

Prenzlin returned to the area around Capitol grounds in the afternoon of January 6, again on the East Side.  When he arrived the second time, the security perimeter was still intact. According to Prenzlin, about 20 minutes after he arrived in the afternoon, he saw people push through the bike rack barricades and flood into the restricted area on the East Plaza of Capitol grounds.[3]  Prenzlin knew that the barricaded area around the Capitol was "off limits" on January 6 to anyone not expressly authorized to be in that area.  He saw police officers guarding the security

---

[2]       The information and quotations in this section come from statements made in Prenzlin's post-arrest interview with the FBI, unless otherwise indicated.

[3]       The breach of these barriers on the East Side occurred at approximately 1:59 p.m.

perimeter and knew he "couldn't just waltz along in."  Nevertheless, Prenzlin entered the restricted area shortly after the barriers were breached by rioters.[4]

Prenzlin remained in the restricted area of the East Plaza for thirty to forty minutes before entering the Capitol building.  While there, still outside of the Capitol building, Prenzlin saw altercations between police and rioters, including the deployment of flash bangs, and saw something that looked like smoke emanating from the East Rotunda Doors.  Prenzlin saw rioters running up the stairs toward the East Rotunda Doors, which Prenzlin characterized as "storming it [the building]."  Based on these observations, Prenzlin knew that what was happening in and around the Capitol "was obviously not friendly."

Prenzlin entered the Capitol building through the Upper House Door at approximately 2:51 p.m.  Prenzlin walked past a magnetometer that was not being used to screen visitors entering the building:

---

[4]     It is not clear exactly when Prenzlin entered the restricted area of the East Plaza after it was breached.     However, in an open-source video posted to YouTube, *available at* https://www.youtube.com/watch?app=desktop&v=tnLLmjdAcUI&t=2607, Prenzlin is visible at video marker 43:26, near the base of the East Steps, very close to the Capitol building.  About five and a half minutes earlier, around video marker 36:53, the video shows the mob breaching the East Steps of the Capitol building.  That breach occurred at approximately 2:06 p.m.  Therefore, Prenzlin was next to the Capitol building, well inside the restricted area, at approximately 2:11 p.m., about 12 minutes after the bike rack perimeter was breached.



*Exhibit 1 – CCTV Camera showing Upper House Door at appx. 2:51 p.m., Prenzlin circled in red*

Prenzlin then walked down a corridor to the left of the Upper House Door where he observed a group of officers from the Metropolitan Police Department (MPD) arrive.  They were wearing their distinctive police uniforms, including bright-colored vests identifying them as police, helmets bearing the letters "MPDC," badges, name plates, and patches.  Prenzlin claimed the officers "didn't explicitly tell me to leave necessarily," but he knew "they didn't want us there.  I'm sure it wasn't making their job easy."



*Exhibit 2 – MPD Body Worn Camera (BWC)*



*Exhibit 3 - MPD Body Worn Camera (BWC)*

BWC shows MPD officers arranging themselves in a formation to clear the corridor in which Prenzlin was standing.  Prenzlin exited the building as part of the crowd that MPD officers cleared from the corridor, as shown in CCTV.  Prenzlin remained in the building for approximately 3 minutes and 35 seconds before exiting via the same door that he entered.  After exiting the building, Prenzlin "stuck around [to see] all the craziness happen," and ultimately left the area, "maybe an hour after they had rolled the girl [Ashli Babbitt] out."  Ashli Babbitt was placed in an ambulance around 3:01 p.m.  If Prenzlin's time estimate is correct, Prenzlin spent approximately two hours total on Capitol grounds on January 6, observing "the craziness."

*Prenzlin's Statements*

Prenzlin voluntarily agreed to an interview with the FBI at the time of his arrest on September 17, 2021.  The interview was video and audio recorded.

In addition to the statements described above, Prenzlin engaged in the following exchange with the interviewing FBI agent:

AGENT 1:     At some point, you went inside the Capitol, correct?
PRENZLIN:   I did not.

So, I went up to the stairs here *[indicates on hand-drawn map of Capitol building and grounds]*, because I wanted – I was walking along, like these grounds just to get a closer look and see what was going on.  But I didn't go inside the Capitol.

AGENT 1:   So you never went inside the building at all? [unintelligible]

PRENZLIN:   *[shakes head, indicating "no."]*

AGENT 2:   Think about what you're saying.

*[Agents and Prenzlin speaking over each other]*

PRENZLIN:    So, I went up the steps, and then I went through that door, *[indicates]* and then there were already police lining up and everything there.  I just wanted to see what was going on.  People were walking in and out.  I maybe went 20 feet?  But I didn't go too far in there.

AGENT 1:   Ok, just to be clear, we're talking about the building, the common people definition, it's got a roof, it's got a door.  That's what we mean when we say inside the building.  We're not trying to, like, make the building into something it's not.  We're talking about, like, the building.  What people think is the building.  So, at some point did you walk through a door and into a hallway?

PRENZLIN:   Yes, into the hallway.

AGENT 1:   You did?

PRENZLIN:   Yes. It was right here *[indicates]*. I went in a little bit, and then I was able to look to the right and then I walked out.  Because there was already people in there and I just wanted to leave.

AGENT 1:   OK, I'll mark that with a star *[marks on map]*.  Ok, well, help me understand, Brandon, 'cause you just said the exact opposite, you said you didn't go inside, now you say that you did?

PRENZLIN:   Yes.

AGENT 1:   Help me out with that.

PRENZLIN:   So, I went inside for a very short period of time, I didn't go inside, like deep into the Capitol like many of, like other people did.

AGENT 1:   Right, but that's not what I asked you.  I asked if you went inside the Capitol, period, and you said you didn't. Right?

PRENZLIN:   Right.

AGENT 1:   So why'd you deny it?

7

PRENZLIN:   Well, I was thinking that you were talking about like going in and like being a part of the people doing bad things.

…

AGENT 1:   So again, let's try to step back, reset.  Did you go inside the Capitol building on January 6?

PRENZLIN:   Yes.

When asked why he decided to enter the Capitol building, Prenzlin said, "I saw that there was already all this other stuff going on and I wanted to see the inside of the Capitol and see what was going on."  Prenzlin said that "curiosity just got the best of [him]," and that he believed his conduct to be "innocent enough on [his] part" because police had "bigger problems to deal with."  Prenzlin agreed that these "bigger crimes" gave him "cover" to enter the Capitol building.

*The Charges and Plea Agreement*

On September 17, 2021, Brandon Prenzlin was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(G) and (D).  He was arrested the same day.  On November 22, 2021, Prenzlin was charged by four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).  On March 25, 2022, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building.  By plea agreement, Brandon Prenzlin agreed to pay $500 in restitution to the Architect of the Capitol.

**III.   Statutory Penalties**

Prenzlin now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G).  As noted by the plea agreement and the U.S. Probation Office, Prenzlin faces up to six months of imprisonment and a fine of up to $5,000.  Prenzlin must also pay restitution under the terms of his plea agreement.  *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79

(D.C. Cir. 2008).  As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it.  18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence.  Some of those factors include:  the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6).  In this case, as described below, the Section 3553(a) factors weigh in favor of a short period of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history.  It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants.  By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances.  No rioter was a mere tourist that day.

To be clear, had Prenzlin personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct.  The absence of violent or

9

destructive acts on the defendant's part is therefore not a mitigating factor in misdemeanor cases, and it does not meaningfully distinguish Prenzlin from most other misdemeanor defendants.

While looking at Prenzlin's individual conduct, this Court should look to a number of critical aggravating and mitigating factors, to include: (1) whether, when, and how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive or dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

By entering the Capitol when he did, and remaining on the grounds for a significant period of time, Brandon Prenzlin personally contributed to the substantial difficulties faced by the police on January 6. On that day, police were unable to execute effective crowd control, take rioters into custody, quell violence, and ultimately protect the Capitol, all because a crowd of uncontrollable size overran the vastly outnumbered officers. Prenzlin was part of that crowd. Prenzlin believed that he had cover to enter the Capitol building, just because he was curious, because he knew that police were preoccupied by "bigger problems." He saw the nonlethal force that police were deploying in an attempt to disperse the crowd. He knew that the engagement between police and ritoers was "not friendly." It was violent. In spite of this—or rather, because of it—Prenzlin thought he could take advantage of officers' distraction to "get a closer look."

A mob is not a mob without numbers.  Individual rioters contributed to those numbers, one by one.  Prenzlin was one such contributor.  And, even if all he did was enter the building for a limited time and observe the chaos, that in itself is significant.  In terms of time spent inside the building, Prenzlin certainly is one of the least culpable rioters to face sentencing.[5]  But the blatancy of his decision to enter the building amidst violence is aggravating.

As is the fact that Prenzlin lied—twice—when asked directly whether he entered the Capitol building.  The interviewing agent asked, "you went inside the Capitol, correct?"  Prenzlin replied, "I did not," and then repeated, "I didn't go inside the Capitol."  Prenzlin then tried to backpedal:

| | |
|---|---|
| AGENT: | You just said the exact opposite, you said you didn't go in, now you say you did? |
| PRENZLIN: | Yes. |
| AGENT: | Help me out with that. |
| PRENZLIN: | So, I went inside for a very short period, I didn't go inside, like deep into the Capitol like many of, like other people did. |
| AGENT: | [T]hat's not what I asked you.  I asked if you went inside the Capitol, period, and you said you didn't. Right? |
| PRENZLIN: | *[agrees.]* |
| AGENT: | So why'd you deny it? |
| PRENZLIN: | Well, I was thinking that you were talking about like going in and like being a part of the people doing bad things. |

Prenzlin was asked a straightforward question—whether he went inside the Capitol.  He immediately and flatly denied that he did, using a complete sentence, no less.  There is no credible argument that Prenzlin did not understand the question, or that his answer was equivocal.

---

[5]      It bears some emphasis that Prenzlin left the building only after MPD officers began to clear the hallway in which he was standing.  It is impossible to know whether Prenzlin's time in the building would have been so limited had MPD officers not arrived and cleared the hallway precisely at the time when Prenzlin came in.  Nevertheless, his time in the building was limited and the evidence suggests that he complied with police commands to leave the building.

Prenzlin's attempt to explain his denial is nonsensical and does not comport with any reasonable interpretation of "inside the Capitol." This falsehood is aggravating. Accordingly, the nature and the circumstances of this offense clearly establish that a meaningful restriction on the defendant's liberty in the form of a short term of incarceration is warranted in this case.

### B. Prenzlin's History and Characteristics

As set forth in the PSR, Brandon Prenzlin has no criminal history other than traffic infractions. (PSR 22 ¶¶ 29-35.) Prenzlin was fired from the job he had on January 6 due to the instant offense. Per the PSR, Prenzlin has been working as an independent contractor for a different grassroots political organization.

Prenzlin has not been fully compliant with the conditions of his release. As stated in the PSR, Prenzlin has repeatedly failed to comply with the minimal conditions of his release, missing several telephonic check-ins with pretrial services (November 27, 2021; December 11, 2021; December 18, 2021; January 1, 2022; January 8, 2022; and April 2, 2022).

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[6] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21

---

[6]     Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.  Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration.  For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.  As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70.  Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation."  *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have

recognized, democracy requires the cooperation of the citizenry.  Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society.  Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence.  This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss).  And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences.  There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Brandon Prenzlin's statements illustrate the need for limited specific deterrence in this case.  Even setting aside his direct denial of his conduct when asked if he went inside the Capitol, Prenzlin's interview exhibits the kind of indifference that led him to conclude that his presence on Capitol grounds and in the building was "innocent."  His statements are exactly the kind that lead the public to conclude that Prenzlin and others like him—people who built a frenzied mob with their bodies—were simply "tourists."  Make no mistake, this was no ordinary day at the Capitol and Prenzlin was no tourist.  Prenzlin does not seem to recognize—either at the time that he entered the Capitol building and grounds or during his interview—that, simply by *being there*, *he* was preventing police officers from regaining control of the building and therefore, *he* was a threat to the safety and security of police and members of Congress.

The government acknowledges and credits the fact that Prenzlin accepted responsibility early by entering into this plea agreement.  But Prenzlin's failure to acknowledge his role in the

danger and violence of January 6, 2021, demonstrates that a meaningful sentence beyond probation is necessary to deter this defendant from engaging in similar conduct in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[7]  Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind.  Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment.  The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, were not minor crimes.   A probationary sentence should not necessarily become the default.[8]  Indeed, the government invites the Court to join Judge Lamberth's admonition that, "I don't want to create the impression that probation is the automatic outcome here because it's not going to be."  *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*,

---

[7]    Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[8]    Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF),  and  *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF).  The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Prenzlin has pleaded guilty to Count Four of the Superseding Information, charging him with parading, demonstrating, or picketing in a Capitol building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long she remained inside, the nature of any statements she made (on social media or otherwise), whether she destroyed evidence of her participation in the breach, etc.—help explain the differing recommendations and sentences. And as that discussion illustrates, avoiding

unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity.  *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007).  The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of federal government, the vast size of the mob, the goal of impeding, if not preventing, the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims.  Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases has increased and the pool of comparators has grown, the effect on sentences of obviously aggravating considerations has become more apparent.  The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case presents exactly the same mix of aggravating and mitigating factors present here, this Court may consider the sentence imposed on Richard Watrous, 21-cr-627 (BAH), for reference.  Like Prenzlin, Watrous entered the Capitol building through the

17

Upper House Door, at 2:48 p.m., nearly the exact same time as Prenzlin.  Watrous also exited the

Upper House Door at 2:53 p.m., like Prenzlin.  Watrous remained on the terrace near the Upper

House Door, where he saw a rioter with a bottle of wine that the rioter said he stole from Nancy

Pelosi's office.  Watrous reentered the Capitol some time later and remained for an indeterminate

amount of time.[9]  Watrous minimized his conduct when interviewed by the FBI and suggested that

the riot was the fault of Capitol Police.

The government recommended 14 days of incarceration and the Court imposed 14 days of

incarceration as a condition of probation.  The Court focused on Watrous's knowledge that the

Capitol building and grounds were secured and not open to the public, that Watrous saw red flags

such as flash bangs and tear gas being deployed, and that he was aware of the shooting of Ashli

Babbitt.  Of this conduct, the Court said: "Despite these obvious indicia that the police were trying

unsuccessfully to keep people out but were being overwhelmed by this angry mob, [Watrous]

exploited the opportunity and he entered through the Upper House Door at about 2:48 p.m. and

stayed inside for five minutes." *United States v. Richard Bryan Watrous*, 1:21-cr-00627 (BAH),

Tr. 04/21/2011 at 47.

Watrous's case is a good model for this Court given the similarities with Prenzlin's case.

Both defendants entered and exited the Upper House Door at nearly identical times with full

knowledge that (a) it was unlawful for them to be on Capitol grounds and (b) the mob around them

was violent.  Watrous also minimized his conduct to the FBI after the riot.  Watrous's case

presented a few aggravating factors not present in Prenzlin's case—Watrous entered the Capitol a

second time, had some limited criminal history, and had expressed interest in joining the Proud

---

[9]     The only evidence of Watrous's reentry was his own statement to the FBI.  The government
was not able to locate video of Watrous's reentry and therefore did not provide evidence as to the
location or times of his reentry or second exit.

Boys.  Prenzlin's case also presents unique aggravating factors—he didn't just minimize his conduct to the FBI, he lied about having been in the Capitol at all and tried to cover his tracks with an extremely dubious explanation.  Further, while Prenzlin has no criminal history other than traffic infractions, he has not been compliant with the minimal conditions of his release.

This Court may also consider the sentence imposed on Jennifer Heinl, 21-cr-370 (EGS). In that case, the government requested 14 days' incarceration and the Court imposed 14 days' intermittent incarceration as a condition of probation.  Heinl witnessed clashes between rioters and law enforcement before entering the Capitol, went in anyway, and made multiple false statements to FBI.  Heinl entered through the Senate Wing Door within ten minutes of the initial breach and remained in the building for approximately 47 minutes.  Though Heinl's time inside the Capitol was significantly longer than Prenzlin's, Prenzlin spent a significant amount of time on the grounds, casually observing "the craziness."  Time inside the building itself is a significant aggravating factor because rioters inside the building specifically prevented law enforcement from securing the building, but every rioter *outside* was a potential rioter *inside* from the police's perspective.  A mob outside is still a serious threat.  Prenzlin had seemingly no concerns about remaining on the grounds, near the building, for over an hour despite seeing police deploying nonlethal force to deter the crowd and knowing from the beginning that his presence was unlawful.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.    This Court's Authority to Impose a Split Sentence

This Court has the authority under 18 § 3561(a)(3) to impose a "split sentence," i.e., a sentence requiring both a term of imprisonment and a term of probation, on a defendant who has been convicted of a "petty offense." *See United States v. Little*, No. 21-CR-315, 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (Lamberth, J.) (explaining why "a split sentence is permissible under law and warranted by the circumstances of this case"); *United States v. Sarko*, No. 21-CR-591, 2022 WL 1288435, at *1 (D.D.C. Apr. 29, 2022) (Kollar-Kotelly, J.) ("explain[ing the Court's] reasoning for imposing a split sentence"); *United States v. Caplinger*, No. CR 21-0342 (PLF), 2022 WL 2045373, at *1 (D.D.C. June 7, 2022) (Friedman, J.) ("a split sentence is permissible for a petty offense and therefore is an option for the Court in Mr. Caplinger's case").

But this Court need not decide that question in this case because there is no dispute that such a defendant can be required to "remain in the custody of the Bureau of Prisons during nights, weekends, or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release." 18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration imprisonment as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in

"split intervals" over weekends or at night.  *Id.*  Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two."  *Id.*

Although the statute does not define an "interval of time," case law suggests that it should amount to a "brief period" of no more than a "week or two" at a time.  *See United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation was inconsistent with Section 3563(b)(10)); *see also United States v. Anderson*, 787 F. Supp. 537, 538 (D. Md. 1992) (continuous 60-day incarceration not appropriate as a condition of probation).  A 14-day term of imprisonment is therefore permissible under Section 3563(b)(10).  *See United States v. Stenz*, 21-cr-456 (D.D.C. Feb. 17, 2022) (Howell, C.J.) (imposing imprisonment in 14-day period under Section 3563(b)(10); *United States v. Schornak*, 21-cr-278 (D.D.C. Feb. 18. 2022) (Howell, C.J.) (same); *United States v. Herendeen*, 21-cr-278 (D.D.C. Apr. 1, 2022) (Howell, C.J.) (same); *United States v. McCreary*, 21-cr-125 (D.D.C. Apr. 1, 2022) (Howell, C.J.) (same); *United States v. Reed*, 21-cr-204 (D.D.C. Apr. 14, 2022) (Howell, C.J.) (same); *United States v. Watrous*, 21-cr-627 (D.D.C. Apr. 21, 2022) (Howell, C.J.) (same); *United States v. Vuksanaj*, 21-cr-620 (D.D.C. Apr. 29, 2022) (Howell, C.J.) (same).

No court appears to have decided whether a term of continuous imprisonment greater than two weeks but less than 30 days is consistent with Section 3563(b)(10), and the government does not advocate such a sentence here. Practical concerns with multiple short terms of intermittent

confinement (i.e., nights and weekends in jail), which would require repeated entries and departures from a detention facility during the COVID-19 pandemic, thereby increasing the risk of spreading contagion in the facility, may militate against imposing this type of "intermittent" confinement.  For that reason, any 14-day term of imprisonment imposed as a condition of probation under Section 3563(b)(10) should be ordered to be served without interruption.

## VI.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors.  As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence.  Balancing these factors, the government recommends that this Court sentence Brandon Prenzlin to 14 days' incarceration, 36 months' probation, 60 hours of community service, and $500 restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:   _____
      Kathryn E. Fifield
      Trial Attorney
      U.S. Department of Justice, Crim. Div.
      Detailed to the D.C. U.S. Attorney's Office
      601 D Street, N.W.
      Washington, D.C. 20530
      (202) 320-0048
      Kathryn.fifield@usdoj.gov